Moncure, J.
Before the merits of this case are considered, it is necessary to dispose of several preliminary questions.
1. As to the order of the Circuit court in the proceeding for contempt. It is not an interlocutory order made in the cause; much less an order adjudicating the principles of the cause. A contempt of court is in the nature of a criminal offense ; and the proceeding for its punishment is in the nature of a criminal proceeding. The judgment in such a proceeding can be reviewed, by a superior tribunal, only by writ of error, and not always in that way. Code, p. 682, ch. 182, § 2; p. 737, ch. 194, § 24, 25, 26 and 27; and p. 779, ch. 209, § 1 and 4. This appeal, so far as it is from that order, must therefore be dismissed.
2. As to the objection that no appeal lies from the other order; it being a mere refusal of the judge in vacation to dissolve the injunction, and not an order adjudicating the principles of the cause. There seems to be no substantial difference between the provision on this subject in the Code, p. 682, ch. 182, § 2, and the law as it existed when the Code took effect. In Lomax v. Picot, 2 Rand. 247, it was decided that an order overruling a motion to dissolve an injunction might come within the terms of the law allowing appeals from interlocutory orders, and within the mis *58 chief intended to be remedied by that law. The aPPea'l in that case was from such an order, and the court entertained jurisdiction of it. In Talley v. Tyree, 2 Rob. R. 500, it was held, in accordance with Lomax v. Picot that an appeal lies to this court from an order of a Circuit court overruling a motion to dissolve an injunction which was improvidently granted. The law under which those two cases were decided being the same in effect with the provision on the subject in the Code, they maintain the right of appeal from the order in this case. That order adjudicated the principles of the cause, if any order overruling a motion to dissolve an injunction can have that effect. The court, for good cause shown, may refuse to dissolve an injunction and continue it to the hearing, without adjudicating the principles of the cause ; in which case of course no appeal would lie from the order. And even when the principles of the cause are adjudicated by the order, an appeal may be refused, if the court or judge to whom the petition therefor is presented deems it most proper that the cause should be proceeded in farther in the court below before an appeal is allowed therein. Code, p. 684, ch. 182, § 10. Or if an appeal is allowed in such a case, it may be dismissed as having been prematurely allowed, if the court deems it most proper that the cause should be farther proceeded in as aforesaid. The order for the injunction in this case was made by the judge in vacation on the 22d of November 1854. It was made on due notice of the motion therefor to the Baltimore and Ohio Rail Road Company, and after hearing the argument of the counsel of both parties. The reasons of the judge for making the order were given at length, in writing, from which it appears that he then fully considered the principles of the cause as they appeared in the bill and exhibits. The injunction was not perfected by the execution of process until March *59 1855. The appellants filed their answer on the 30th of April, and on the 12th of May gave notice to the appellee of a motion to dissolve, to be made to judge in vacation on the 5th day of June next following. On that day the parties appeared by counsel before the judge, and the motion was accordingly made. It was made as well upon the distinct ground that the injunction had been improvidently awarded, as upon the cause as it then stood. The appellee objected to the motion, and to the determination thereof, on the grounds, 1, that the Central Ohio Rail Road Company had not filed an answer; 2, that exceptions had been taken to the sufficiency of the answer of the appellants, which were still pending and undetermined ; and 3, that that answer was not verified by affidavit. The said matters being argued by counsel and considered by the judge, he (for the reasons given at the hearing of the motion for the injunction, and filed with the order refusing to dissolve it, and upon the authority of certain cases referred to,) overruled the motion to dissolve, and directed the order of injunction to be continued until further order or decree.
Both parties had taken depositions to sustain their respective allegations in the bill and answer; and those depositions formed part of the cause as it stood when the motion to dissolve was made. The refusal of the judge to dissolve the injunction adjudicated the principles to this extent, that the injunction had not been improvidently awarded, and that as the cause then stood it ought still to be continued. It is therefore such an order as may be appealed from. And it does not seem most proper that the cause should be proceeded in farther in the court below, before an appeal is allowed therein. The parties had ample time to prepare, and it seems did fully prepare, the cause for the decision of its principles. It is not probable that any other fact will be brought into it *60 which can at all affect them. It is mainly, if not entirely, an injunction cause, in which the most sum-proceedings compatible with its correct decision seem be proper. Irreparable mischief may be done, not only by denying, but also by granting and refusing to dissolve an injunction. The legislature has provjc|ef] ¿hg most summary means of relief in both cases, and has authorized an application to a judge in vacation, not only to grant, but to dissolve an injunction. An order refusing to dissolve an injunction seems, therefore, to be peculiarly within the meaning and object of the law authorizing appeals from interlocutory oi’ders adjudicating the principles of a cause. That the order in this case was made in vacation can make no difference. It is an interlocutoiy order made by authority of law in the cause, and comes within the letter as well as the spirit of the law in regard to appeals. In Penn v. Whiteheads, 12 Gratt. 74, this court entertained jurisdiction of an appeal from such an order, and affirmed it so far as it overruled the motion to dissolve, but reversed it in other respects. That case at least shows that it is no objection to the appeal in this case that the order appealed from was made in vacation.
3. As to the objection that the Central Ohio Rail Road Company had not filed an answer. It is a general rule that an injunction, properly granted, will not be dissolved until all the defendants have answered. But to this l’ule there are many exceptions. 2 Rob. Pr. 242; Adams’ Equity 196, and note 1. It may be dissolved upon the answer of one or more defendants within whose knowledge the facts charged especially or exclusively lie, or upon whom the gravamen of the charge rests; and this, too, where all the defendants are implicated in the same charge, and the answer of all can and ought to come in, if the plaintiff has not taken the requisite steps, with reasonable diligence, to *61 expedite his cause. See the cases cited in the note to Adams, above referred to. In this case the appellee cannot be charged with any want of diligence in expediting the cause. But the Central Ohio Rail Road Company is a foreign corporation, and cannot be compelled to file an answer. An opportunity will be afforded to the plaintiff, in a proper case, to enforce an answer from all the defendants, before a motion will be heal’d to dissolve an injunction properly granted; but there can be no reason for affording such an opportunity as to defendants who are out of the jurisdiction of the court, and cannot be compelled to answer. Again, the answer of the Central Ohio Rail Road Company is not required for the purpose of discovery. Rone of the officers or members of the corporation are made defendants, as might have been done for that purpose; and it is not perceived what effect an answer from that company could have upon the right of the appellants to have the injunction dissolved. Where a discovery is required of a defendant who may be compelled to make it, the answer, though it may not be evidence against a codefendant, may yet properly have some effect in preventing or postponing a dissolution of the injunction.
4. As to the objection that the appellants’ answer was insufficient. This objection is answered by the rule that upon a motion to dissolve an injunction on bill and answer, the facts alleged in the bill and not denied by the answer, are taken to be true; which is the most that the appellee could obtain from a full answer. Rone of the officers or members of the Baltimore and Ohio Rail Road Company are made defendants, as they might have been, for the purpose of discovery. But the president of the company was examined as a witness, and answered all the interrogatories propounded to him by the appellee.
5. As to the objection that the appellants’ answer *62 was not verified by affidavit. A corporation cannot be sworn, and therefore must put in its answer under its common seal only. Story’s Eq. PI. § 235. If the plaintiff wishes to have a sworn answer, he must make some of the officers or members of the corporation parties. The answer of a corporation not being verified by affidavit, is no evidence for the defendant, though responsive to the bill. But it at least has the effect of putting the allegation to which it responds in issue, and of imposing on the plaintiff the burden of proving it. This is, undoubtedly, its effect on the hearing of the cause; and it is not perceived why the same effect does not exist on a motion to dissolve. That it does, was decided by Judge Washington in Haight v. Proprietors of Morris Aqueduct, 4 Wash. C. C. R. 601. The case of Fulton Bank v. New York & Sharon Canal Company, 1 Paige’s R. 311, seems to be contra. But the circumstances in that .case were peculiar. The case of the Union Bank of Georgetown V. Geary, 5 Peters’ R. 99, tends to sustain the case in 4 Wash, supra. The difficulty in-that case was in not giving to the answer of a corporation, under its common seal, the same effect as to the sworn answer of an individual. But the court inclined to adopt it as a general rule, that an answer not under oath is to be considered merely as a denial of the allegations in the bill, analogous to the general issue at law, so as to put the complainant to the proof of such allegation. Even if it would have been improper to have dissolved the injunction in this case.on the bill and answer only, it might still have been proper to have done so in the condition in which the case stood when the motion was made.
It may be remarked, in reference to all of the three last mentioned objections, that whether they are well or ill founded, it was error to refuse to dissolve the injunction if it was improvidently awarded.
*63 Having disposed of all the preliminary questions, I will proceed to consider whether, on the merits, the motion to dissolve the injunction was properly ■, -, ruled.
Wheeling claims to have the acts complained enjoined, because they are in violation of her rights; first, under the act of March 6, 1847 ; secondly, under the contract of July 6, 1847; and, thirdly, as a stockholder. And,
First: Under the act of March 6, 1847.
Wheeling claims that under this act the benefits of the western terminus of the Baltimore and Ohio rail road are secured to her; that the appellants had no power to do, or were bound to refrain from doing, any thing which might deprive her of any of these benefits; and that the acts enjoined would have that effect, and therefore are unlawful. On the other hand, the appellants contend that they have done every thing they were bound to do to secure to Wheeling the benefits of the western terminus; that their interest and duty required them to connect afBenwood with the Central Ohio rail road, which terminated on the opposite side of the river at Bellair; that they were expressly authorized by the act to make such a connection; and that in doing the acts enjoined they were doing no more than was necessary to enable them to effect that object. Let us see what are the relative rights of the parties. And to enable us to do so we must look to the act itself, and as far as may be necessary, to the preceding acts in pari materia, and to the surrounding facts.
The first Virginia act on the subject of the road, the act of March 8, 1827, which re-enacted, with modifications, the Maryland charter passed in the pi-e-ceding month, did not fix any definite terminus, but required that the road should not strike the Ohio lower down than the mouth of the Little Kanawha. *64 In the succeeding year an act was passed by Pennsylva™a> authorizing the company to make the road that state, on condition of making it, or a branch, to Pittsburg. Under the acts of these three states, the company had a broad river front, as they call it, extending from Pittsburg to the mouth of the y,jttle Kanawha, in which to select a terminus. It seems they selected two, Wheeling and Pittsburg. But the time limited by these acts expired, leaving the work unfinished beyond Harpers Ferry. In 1836, 1837 and 1838, other acts were passed by Virginia, assuming that Wheeling was to be the terminus, authorizing conditional subscriptions to the work by Wheeling and the state, and extending the period of its completion to 1843. But this period also expired, leaving the work unfinished beyond Cumberland.
Pennsylvania, it seems, was unwilling to renew the permission to make the road through that state, except on condition of making Pittsburg the terminus'; and the company could get to the Ohio river at no other point but by passing through the territory of Virginia, without passing through that of Pennsylvania. They accordingly made an application to the legislature at the session of 1843-44 for the privilege of extending their road to the Ohio, without restriction as to terminus, except that it should be north of the mouth of the Little Kanawha, as in the original act of 1827. “ This, (in the language of the learned counsel for Wheeling,) was the opening of the controversy between the company and Wheeling.” The application failed. It was renewed at the session of 1844-45, and again failed. But an act was then passed, (Sess. Acts, p. 69,) the first section of which authorized the company to construct their road, in whole or in part, - through the territory of this state, “ so as to terminate and strike the Ohio river at the city of Wheeling;” and in the 17th section it was declared that “ no part *65 of this act shall be so construed as to authorize or permit the said company to construct their said rail road, or any branch thereof, to any point on the Ohio river below the said city of Wheeling,” The act contained many other provisions objectionable to the company, and they rejected it. In 1845-46 another act was passed, repealing some of the objectionable features of the act of 1844-’45, but leaving the provisions as to the route and terminus in force. Sess. Acts, p. 88. This act was not accepted. At the next session of the legislature, the act of March 6, 1847, was passed; which was accepted, (after the contract with Wheeling of July 6, 1847, was entered into.) The terms of this act and the relative rights of the parties under it, are now to be considered.
The first section authorizes the company to complete their road through the territory of the state, so as to pass from a point in the ravine of Buffalo creek at or near the mouth of Piles’ fork to a depot to be established by said company on the northern side of Wheeling creek in the city of Wheeling, by such route as, upon minute estimates, &c. shall appear to be the cheapest upon which to construct, maintain and work said road. Provided that it should not be made to enter the ravine of the Ohio river at any point further south than the mouth of Fish creek: or at any point further south than Grave creek, if Wheeling would pay the excess of the cost of the latter over the former route.
The second section is in these words : “ That to secure to the said city of Wheeling the benefit of the western terminus, all parts of the said rail road between the Monongahela river and said terminus, shall be opened for the transportation of freight and passengers simultaneously; and the aggregate charge for toll and transportation, upon freight and passengers respectively, shall be the same between Baltimore and *66 any point on said road within a direct distance of five miles from the Ohio river, as between Baltimore and
The 6th section declares, “that the said company shall be subject to the provisions of the act of assembly passed on the 11th day of March 1837, establish- ^ general regulations for the incorporation of rail road companies, with respect to that portion of their road or other improvements now or hereafter to be constructed within this commonwealth, so far as the same are properly applicable;” and a proviso is added as to charges on way trade and travel.
The 9th section authorizes Wheeling to subscribe to the capital stock of the company such sum not exceeding one million dollars, and upon such terms as may be agreed upon between the council of said city and said rail road company.
By the 11th section, the act is to be accepted in six months, and the road to be begun in three years, and completed in twelve.
By the 25th section of the general rail road law above referred to, authority is given to the president and directors of a company, which is subject to that law, to make branches or lateral rail roads in any direction whatever, in connection with their rail road, not exceeding ten miles in length, &c. This provision is to be considered as much a part of the act of March 6, 1847, as if it had been embodied therein in totidem verbis, if it be “properly applicable.” The appellants contend that it is so applicable, and under it claim the right to make the connection at Benwood. On the other hand, Wheeling contends that it is not so applicable at least to the extent of authorizing that connection. She does not deny that the provision is applicable to some extent; that it confers on the company the branching power. Indeed, the 4th section of the act of March 6, 1847, expressly recognizes the *67 existence of such a power. But she contends that it must be taken in subordination to the main intent of the act to confer on her the practical benefit of the western terminus; and that it cannot be so exercised as to contravene that benefit: especially, that it cannot be exercised for the purpose of connecting with the Ohio river or the improvements on the other side, except at Wheeling. This is the main, if not the only hinge on which this controversy turns.
I am of opinion that the provision is applicable, and does authorize the connection in question. What was the state of things when the act was passed ? Wheeling had desired not only that the road should run to her, but run and terminate in such a way as that it could make no connection with the river or improvements beyond it but in that city. The company had desired so to run and terminate the road as to be in a position to make the most favorable connections with those great highways. The legislature had favored the views of Wheeling, and passed the acts of 1845 and 1846. But those acts could háve no effect without the consent of the company. The road was to be made with their money, and would cost about six million dollars. They were unwilling to expend and risk so large a sum without more favorable terms than those acts presented, and therefore declined to accept them. The route to Pittsburg was still within their power; and some of the stockholders, it seems, desired to pursue that route. But a majority were still anxious to terminate the road at or below Wheeling. It very clearly appeared that if it passed through Virginia, it must terminate at Wheeling : and the company were willing to make it to Wheeling, provided they could pursue such a route as would place them in a position to make the connections they desired. There were two great rail roads then in a course of construction in Ohio, and ap *68 proaching the river: The Central Ohio road pass-through the centre of the state, and the Cincin nati and Marietta road passing through the southern Par^* The company desired to connect with both of these roads. They supposed that by running their road to the river at the mouth of Fishing creek, and ^ence Up -¡^g river about forty miles to Wheeling, the object they had in view would be effected. They would then have it in their power to connect with those roads at any point or points in all that river front of forty miles, which the termination of those roads on the river might render necessary. They accordingly proposed to the legislature, at the session of 1846-47, so to run their road. Their proposition was rejected, and the act of that session was passed, the terms of which have already been referred to. Wheeling was in favor of it; and her object was the passage of such an act as would be most apt to attain her views, and at the same time hold out sufficient inducements to its acceptance by the company.
In this state of things, it was important that the act should plainly express the intention of the legislature; that nothing should be intended which was not expressed, and nothing expressed which was not intended, in order that there might be no mistake on either side. When, therefore, the legislature by that act gave to the company the branching power without any express restriction, it cannot be fairly presumed that they intended to restrict it. If they had so intended, they ought and would have said so expressly. It was known that the company desired to make connections wherever they could do so to advantage; especially with the river and roads beyond it. And it was known that it might be necessary to connect with those roads below Wheeling, should they terminate below that city. With this knowledge, the act was passed.
*69 Another important fact, tending to show that such a restriction as is contended for was not intended, is, that in the act of 1845, which was rejected by the company, the branching power was given in precisely the same terms as in the act of 1847, but with an express restriction to prevent the road or a branch from striking the river below Wheeling. Why, then, was this express restriction in the act of 1845 left out of the act of 1847, if it was not by design ; and because it was known that, with its insertion, the latter act would have shared the fate of its predecessors, and been rejected by the company? We are irresistibly led to the conclusion, then, that the omission was by design.
It was doubtless the desire of the legislature, as well as of Wheeling and the company, that all the connections with the river and the improvements beyond it should be made in Wheeling. But the subject was not entirely within their control. The Ohio companies might terminate their works according to their pleasure, and would do so according to their interest. They were embarrassed ; and want of funds might prevent them from reaching Wheeling. It was proper, therefore, that the appellants should be left free to make connections wherever necessity might require and the location of their road along the river might enable them. Wheeling, not being able to do better, was willing to incur this risk for the sake of the benefits she expected to derive from the road. It was expressly required to terminate at Wheeling: That benefit she would certainly obtain by its construction; the benefit of a direct and continuous rail way to one of the largest and most important Atlantic cities ; the benefit of daily arrivals and departures of rail road trains from and to that city; and all the local benefits necessarily incident to the terminus of a great rail road. She desired benefits beyond these — the benefit *70 of connections between that and other roads within her limits. Bat she expected to obtain them by the of her position, her wealth, trade, popula^on anfl importance; which she hoped and expected would be sufficient to attract to her limits all connec-
tions which might otherwise have been made at some other point of the road within its limited river front of ten or twenty miles. For these expected benefits the company did not stipulate by the acceptance of the act, except to the extent of a compliance with its terms. It does contain terms which were intended to promote the attainment of these benefits. But these very terms plainly indicate that the company would have the power to make connections below Wheeling, if necessary. The first section, requiring the road not to enter the ravine of the Ohio lower down than a certain point, shows that Wheeling was to incur the risk of intermediate connections. The second section shows the same thing. In requiring all parts of the road between the Monongahela and Wheeling to be opened for transportation simultaneously, and the aggregate charge for toll and transportation to be the same between Baltimore and any point on the road within five miles of the Ohio river as between Baltimore and Wheeling, it was intended to give to Wheeling these advantages in attracting connections to her limits, but not to prohibit them elsewhere.
These being the relative rights of the parties under the act of March 6,1847, have the rights of Wheeling ■ been violated by the appellants ? They made the road within the time and along the route prescribed by the act. It terminates in Wheeling, to and from which all the through trains run, and where all the depots and other structures suitable to the terminus of such a road have been erected, and where a large force of officers, clerks, mechanics and laborers are constantly employed. The requisitions of the 2d section have *71 been strictly complied with; or, at least, there is no complaint in that respect. And the only complaint on the part of Wheeling, is of the connection at wood. Is that a violation of her rights under the act? I think not. I think they had a right to make it, under their branching power’. They deny that the necessity which has arisen to make it was the result of any act or course of policy on their part: And in support of this denial, they refer to and exhibit a letter of their late president, Mr. Swann, in reply to one from the president of the Central Ohio rail road of December IS, 1849, made an exhibit with the bill, in which the writer says, “ This company have no intention of making a terminus at any other point than the city of Wheeling: nor could I advise you to locate your work under any expectation of this company doing more than making their road under their'Virginia charter, to its terminus on the Ohio river at that city. The whole road from the Ohio river to the city of Wheeling will be put under contract at the same time, and pressed to completion, so as to be opened simultaneously throughout its entire length.”
It appears, from the evidence of Mr. Harrison, the present president, and Mr. Done, master of transportation, that the company had no agency, directly or indirectly, in the selection of the route of the Central Ohio road, or in causing it to stop at Bellair. These witnesses say they were anxious to connect with that road through Wheeling, and endeavored to effect that object, but the president of that road refused, and insisted on the connection between Benwood and Bell-air. The appellants, then, had to choose between the alternatives of that direct connection and the circuitous and uncertain one through Wheeling,- in the latter case, subjecting passengers to the inconvenience of an additional journey of eight miles, one-half of it by water or in an omnibus, according to the state of navi *72 gation, and to the danger of being delayed on their way ^y not arriving in time to make the connection; and subjecting themselves, in their competition with °^ler great rival roads, to the disadvantage of such a break. They chose the former, as it was their interest, and I think their right to do. Suppose the Central qj^ roa(j iiaq terminated opposite Moundsville, at the mouth of Grave creek, where the Baltimore road first enters the ravine of the river, and ten or eleven miles below Wheeling, would a connection at that point have been unlawful ? It is necessary to maintain that it would, in order to carry out the principle contended for by Wheeling in regard to the connection at Ben-wood. And so also, if the Cincinnati and Marietta road should reach and terminate at a point opposite Moundsville.
If the company have the right to make the connection at Benwood, it is their right and duty to provide all proper facilities to effect the object in a manner most convenient for their travel and trade; and there is nothing in the manner of making the connection which can give Wheeling a right, under the act of 1S47, to complain.
The next question to be considered is as to her rights:
Secondly: Under the contract of July 6, 1847.
So much of what has been said under the preceding head is applicable to this, that it will not be necessary to say much more. I am of opinion that there is nothing in this contract which can restrain the right to make the connection in question any more than in the act of 1847. The contract was obviously designed on the part of Wheeling to induce the company to accept the act, and prosecute at their earliest convenience the construction of the road. It consists almost entirely of terms to be fulfilled on the part of Wheeling. She agreed, 1, to grant ten acres of land *73 for a depot; 2, to secure the right of way within her limits; 3, to subscribe five hundred thousand dollars to the stock of the company; 4, to waive, sub modo, the control given her by the act of 1S47 over the selection of routes between Fish creek and Grave creek; and 5, to be bound by the contract so soon as the stockholders of the company should accept the act of March 6, 1847, and agree to prosecute, at the earliest convenience of the company, the construction of the road from Cumberland to Wheeling. The acceptance of the act and early prosecution of the work seem here to be the only consideration for the stipulations made on the part of Wheeliug; and this is not affected by any thing that follows in the contract; which contains four other paragraphs: The first of which provides for the return to Wheeling of the amount paid on account of her subscription and cost of depots and interest, in case the road should not be made in time. The second is an agreement on the part of the committee of the company to convene a meeting of the stockholders at as early a day as practicable, and to recommend to them the acceptance of the conditions above referred to. The third is in these words : “ It being the intention of the parties to this agreement, among other things, to secure to the city of Wheeling the practical benefits of the western terminus of the Baltimore and Ohio rail road, according to the provisions of the said law.” The fourth declares the understanding to be, that the necessary surveys and estimates should be made, and the route decided upon, as soon after the ratification of the agreement by both parties as the company should find convenient.
If any additional obligation is imposed on the company, it is by the third of the four paragraphs above mentioned. It is difficult to perceive the precise purpose for which that paragraph was inserted. Without making any speculations on the subject, it is enough *74 to say that, in my opinion, it imposes no additional obligation on the company. The words “ according to the provisions of the said law,” with which the paragraph closes, expressly limits the security referred to, to a compliance with the provisions of the law. It therefore only raises the question which I have already fully considered under the preceding head. Certainly the company, unwilling to accept the act without further inducements from Wheeling, would not have agreed to surrender a right secured to them by that act; especially a right so important to enable them to make the connections they had so long desired. Wheeling knew they desired to make them, and might have an opportunity of doing so at any point in all their river front. She knew they had the branching power, without any express restriction in the act. And if she desired to restrain them, she ought to have done so expressly in the contract. Had she insisted on such a restriction, it would doubtless have resulted in a rejection of the act. The strict rule of construction contended for in regard to charters of incorporation, certainly do not apply to a contract made between two corporations. .The waiver by Wheeling of her control over the selection of routes, (thus giving the company, as they then supposed, the right to enter the ravine of the river as low down as Pish creek, twenty-eight miles below Wheeling, instead of Grave creek, eleven miles below,) serves strongly to show that, instead of giving up the right to make favorable connections below Wheeling, the company desired and intended by the contract to enlarge that right, by extending their river front. That such was their desire and intention, and such their understanding of the contract, plainly appears from the report of the committee, (made in pursuance of a stipulation contained in the contract,) recommending the acceptance of the act and ratification of the con *75 tract to the stockholders. Upon that recommendation the act was accepted and the contract ratified.
It now only remains to be considered, whether the rights of Wheeling have been violated :
Thirdly: As a stockholder.
The ground on which she bases her claim to relief as a stockholder is, that the acts enjoined are ful; and therefore any stockholder of the company may have an injunction to restrain them. Some of these acts are said to be unlawful, without respect to their effect on Wheeling as the terminus; and others, only because in contravention of the purposes of the law to secure to her the benefits of the terminus. I have already disposed of the latter. The former only remain to be considered under this head. As enumerated by the counsel for Wheeling, they are, 1. The construction of a pier in the bed of the river, with a rail way track upon it; 2. The contract with the Central Ohio Bail Boad Company; 3. The transportation of freight and passengers to and from the state of Ohio by ferriage, &c.; and 4. The loan to that company. The appellants deny that they have violated, or intended to violate, the law in any of these respects. But I deem it unnecessary to enquire how far the appellants are implicated in these acts, or whether the said acts or any of them be in themselves unlawful or not; as I am decidedly of opinion that, even if they be so, the claim of Wheeling as a stockholder to have them enjoined cannot be maintained. Undoubtedly there are cases in which a stockholder may be entitled to this mode of relief. Cases, for instance, in which the property or powers of the company are about to be perverted to a purpose wholly or materially different from that which was designed by the act of incorporation. If a company incorporated to make a rail road should be about to make a canal; or, incorporated to make a road from A to B, should be about to make one from A to C. These *76 would be plain and palpable violations of the charter, aDd would be restrained at the suit of a dissatisfied
The cases relied on by the counsel for Wheeling1 in support of her claim as a stockholder, seem to be of this kind. In Beman v. Rufford, 6 Eng. Law & Eq. R. 106, one rail way company gave up the management of its line to another. Lord Cranworth, Y. C., who decided the case, said, “ In my opinion, that is delegating the functions which the legislature has given them to other parties; which they have no possible right to do. For the security of the public, there are a vast quantity of duties imposed on the company,” &c. But even in that case, he said, “I only restrain them from carrying into execution that portion of it, (the agreement between the two companies,) which we call, for want of a better expression, irreparable injury; that is, the expenditure of money which it will be impossible, perhaps, ever to get back again.” The suit there was brought by some of the stockholders in behalf of themselves and the others. Winch v. The Birkenhead, &c. Railway Co. 13 Id. 506, decided by Turner, Y. C., was a similar case; and the right to relief by injunction was sustained on similar grounds. There, too, the suit was brought by one of the stockholders in behalf of himself and all the rest, Even in cases of this kind, relief by injunction has been very cautiously administered; and has been denied to parties in consequence of their acquiescence in the illegal act of the company, or other peculiar circumstances. Graham v. Birkenhead, &c. Co. 6 Id. 132, decided by Lord Cottenham, and Ffooks v. The London, &c. Co. 19 Eng. Law & Eq. R. 7, decided by Stuart, V. C., were cases of this class. Some of the observations of the court in those cases apply very forcibly to this; but I will not prolong my opinion by repeating them.
In this case there has been no perversion of the property or powers of the company to a purpose *77 wholly or materially different from that which was designed by the act of incorporation. The connection at Benwood seems to have been required by the rest of all the stockholders, and was in direct furtheranee of the design of their work to form a part of a great national thoroughfare. Every stockholder, except Wheeling, must have been in favor of that nection; and Wheeling would doubtless have been so, if her relation to the subject had been only that of a stockholder. She has other interests to subserve, which prompt her to endeavor to avail herself of her position as a stockholder to arrest, by injunction, the contemplated connection, though at the imminent risk of loss to all the other stockholders, as well as of great inconvenience to a large portion of the traveling public. Under such circumstances, can she be entertained in a court of equity in her character of stockholder, merely because, in the manner of making the connection, the navigation of the Ohio river may be obstructed, the franchise of some neighboring ferry owner may be interfered with, or the powers of the corporation may, in some other respect, be exceeded or misused. I think not.
I am, therefore, for dismissing the appeal, as improvidently allowed, so far as it is from the order of the Circuit court in the proceeding for contempt; for reversing, with costs, the order of the judge in vacation refusing to dissolve and continuing the injunction; and for dissolving the said injunction.
Allen, P. and Samuels, J. concurred in the opinion of Moncure, J.
Daniel and Lee, Js. concurred in the first, second and third questions considered by Moncure, J. But on the merits they dissented. •
Decree reversed.